**EXHIBIT A**

## <u>AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT</u>

I, Ryan Kotowski, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, states as follows:

## I.   INTRODUCTION AND AFFIANT EXPERTISE

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  I am currently employed as a Special Agent with the DEA and have been since January 2018. During the course of my employment with the DEA, I have received specialized training in the area of narcotics investigations from the DEA Academy in Quantico, Virginia. This academy consisted of 18 weeks of comprehensive classroom and practical training from the DEA in specialized narcotic investigative matters including, but not limited to, drug interdiction, drug detection, money laundering techniques, locating hidden assets derived from narcotics trafficking, and the investigation of individuals involved in the smuggling, cultivation, manufacturing, and illicit trafficking of controlled substances.

2.      Based on my knowledge, training, and experience in the investigation of drug traffickers, I am familiar with the ways in which drug traffickers conduct their business.  My familiarity includes: the various means and methods by which drug traffickers import and distribute drugs; their use of cellular telephones to facilitate drug activity; and their use of numerical codes and code words to conduct drug transactions. I am also familiar with the ways that drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, without limitation, the use of carriers to transport currency and proceeds, and the use of third parties to purchase or hold title to assets.

3.      I submit this affidavit for the limited purpose of establishing probable cause to support the issuance of a Criminal Complaint charging Ronald **ALEXANDER**, ▬▬▬▬▬ Mark **BRINKLEY**, and Thomas Corey **CROSBY** with the offense of Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. § 846.

4.      Because I submit this affidavit for the limited purpose of establishing probable cause to support the issuance of a Criminal Complaint, it only contains a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and the events described in this affidavit.

II.      **SUMMARY OF INVESTIGATION**

5.      The DEA and the Baltimore City Police Department ("BPD") have been investigating the drug trafficking activities of Ronald ALEXANDER. In 2001, ALEXANDER pleaded guilty in the United States District Court for the District of Maryland to Conspiracy to Distribute and Possess with Intent to Distribute Heroin, in violation of 21 U.S.C. § 846. ALEXANDER was sentenced to 240 months of incarceration and released from the Bureau of Prisons in or around May 2018.

6.      On May 1, 2020, the Honorable Catherine C. Blake, United States District Judge for the District of Maryland, authorized the interception of wire communications occurring over the cellular telephone assigned call number 443-787-9459 ("**Target Telephone 4**"), a phone used by **ALEXANDER**. On May 24, 2020, Judge Blake authorized the continued interception of wire and electronic communications occurring over **Target Telephone 4**. Judge Blake also authorized the initial interception of wire and electronic communications occurring over the cellular telephone assigned call number 443-762-1162 ("**Target Telephone 5**"), a second phone used by **ALEXANDER**.  On June 24, 2020, Judge Blake authorized the continued interception of wire and

electronic communications of **Target Telephone 4** and **Target Telephone 5**. On July 23, 2020, Judge Blake authorized the continued interception of wire and electronic communications occurring over **Target Telephone 4**. During the course of the investigation, the DEA also obtained authorization to install and maintain a GPS tracking device on a 2019 Dodge Caravan bearing Virginia license plate URB 7398. This vehicle is registered to **ALEXANDER**.

### III.   ALEXANDER OPERATES A DRUG SHOP WHERE ███████ SELLS NARCOTICS

7.      Interceptions of **ALEXANDER** have revealed that **ALEXANDER** operates a "drug shop" in the vicinity of Spaulding Avenue and Palmer Avenue in Baltimore, Maryland. A drug shop is a location where drug distributors sell drugs in street-level quantities to drug customers. Interceptions revealed that **ALEXANDER** supplies narcotics to ███████, one of the drug distributors at this location.

8.      For example, on May 31, 2020, at approximately 6:27 p.m., **ALEXANDER** used **Target Telephone 5** to call 443-630-4032, a phone used by ███████. During the call, ███████ told **ALEXANDER** that he was at his son's house in East Baltimore. **ALEXANDER** asked ███████ if would be returning. ███████ said that he would and that other individuals had "…done alright, but you know what I mean…I'm gonna need to see you in the morning." From the context of the call, I believe ███████ meant that these unidentified individuals had been moderately successful selling drugs and that ███████ would need to meet with **ALEXANDER** the next morning. I believe this meant that ███████ would need to obtain additional drugs from **ALEXANDER**. **ALEXANDER** then said the "12" (a street term for police) had been looking for ███████ and described the officers as "two white dudes." **ALEXANDER** and ███████ then arranged to meet the next morning between 9 a.m. and 10 a.m. **ALEXANDER** then asked if ███████ would be able to "do something in the morning." I believe **ALEXANDER** wanted to

know if ████ had enough drugs to sell in the morning prior to meeting **ALEXANDER**. ████ answered in the affirmative. **ALEXANDER** then said he did not know if ████ was "broke," which I believe meant out of drugs. ████ said he had "half a joint" left, which I believe referred to a quantity of drugs. **ALEXANDER** then said that with this amount that **ALEXANDER** could sleep a little longer. I believe this meant that **ALEXANDER** would not have to resupply ████ early in the morning since ████ had enough drugs to sell initially. ████ then reiterated the meeting time with **ALEXANDER** and the call ended shortly thereafter.

9.     On June 6, 2020, at approximately 5:03 p.m., **ALEXANDER**, using **Target Telephone 5**, called 443-630-4032. After exchanging pleasantries, **ALEXANDER** apologized to ████ and said that he had not been in town. **ALEXANDER** further said that he had not "even done any bit of cutting" and asked if ████ "had been done." I believe that **ALEXANDER** meant that he had not prepared narcotics (using cutting agents) for distribution and subsequently asked ████ if he had exhausted his supply of narcotics. ████ answered in the affirmative. **ALEXANDER** then said it was his fault since he had been in Virginia. The parties then briefly discussed other matters and the call ended shortly thereafter.

10.    On June 16, 2020, at approximately 9:31 a.m., **ALEXANDER**, using **Target Telephone 4**, received a call from 443-668-3088, a phone used by "S.G."[1] During the initial part of the call, **ALEXANDER** stated, "Is almost, um, almost like it was um, the one that you said they ain't wanna take a chance on but it was good … It it ain't soft or it ain't soft or nothing, it's hard, but it's that color, and I wanted to see what they..."  S.G. responded, "Well where you going at? Um, just hold me hold me a little hold me something till I um, get myself together and get outside." **ALEXANDER** replied, "How long you gon be?" S.G. responded, "I mean I, I don't want to just

---

[1] S.G.'s identity is known to investigators but redacted for purposes of this affidavit.

rush out cos I ain't got nothing lined up right this morning but, I ain't gon be that long. I ain't gon be twelve o'clock, I'm I'm try get I'm try get up now and get myself together."

11.     I believe that during this call that **ALEXANDER** was discussing drug quality, describing the color and firmness of the drugs. I know that drug traffickers often assess the quality of drugs based on these features. S.G. then appeared to ask **ALEXANDER** for drugs, asking **ALEXANDER** to hold for S.G. "something" till he got outside. The two then agreed to meet later in the day.

12.     On June 19, 2020, **ALEXANDER**, using **Target Telephone 4**, called 410-301-6400, a phone used by "UM6400." During the call, **ALEXANDER** engaged in a lengthy discussion with UM6400 about ████. **ALEXANDER** complained that ████ had been getting too high from drugs recently, stating, "I don't know what the fuck wrong with Joe man, he been too high lately man…" UM6400 agreed. **ALEXANDER** then said that ████ had been pulling out all of his money all at a time. UM6400 said, "Yo, why you keep pulling that money out, yo, like ain't nobody gonna try you one time…that how you lost shit." **ALEXANDER** said that the other day ████ had $1,900 in his pocket. I believe the parties were stating that ████ was carrying too much money on him and that he was risking being robbed of that money. As the call continued, **ALEXANDER** remarked, "I'm telling Joe, I said, be realistic man, you went from selling two to three thousand dollars' worth of dope to only selling damn near three, four hundred dollars' worth of dope a day…" **ALEXANDER** continued, "You're only selling that much because you keep running around, you sitting there noddin', you'll selling dope like you you'll sell coke, waiting for people to come to you instead getting out promotin." I believe that **ALEXANDER** meant that ████ had gone from selling two to three thousand dollars' worth of heroin ("dope") to only selling four hundred dollars' worth of heroin. **ALEXANDER** attributed

5

this to ████s use of heroin, stating that ████ was only sitting around and getting high ("noddin'") instead of soliciting customers ("promotin'"). **ALEXANDER** further stated, " "I'm givin you, givin you, two and three thousand dollars' worth of dope and it's taking you almost two weeks to sell two thousand dollars' worth of dope." **ALEXANDER** then stated, "I said man, your clientele, your name, and your clientele, is enough for you to make at least a thousand dollars a day." I believe this meant that **ALEXANDER** had been giving ████ two to three thousand dollars of heroin and that ████ was taking two weeks to sell the drugs when he should be able to sell a thousand dollars of heroin a day.

13.     On July 8, 2020, at around 9:55 a.m., a DEA covert surveillance system installed in the area of Spaulding Avenue in Baltimore captured ████ sitting in a chair in front of 5024 Palmer Avenue.. ████ was speaking to an unidentified woman at the time. At around 9:57 a.m., ALEXANDER's Dodge Caravan arrived and parked near ████. At this time, ████ then walked over to the vehicle and got into the front passenger seat. At around 10:09 a.m., an unidentified man walked up to **ALEXANDER's** Dodge Caravan. Seconds later, ████ got out of the vehicle and walked down Palmer Avenue towards Garrison Avenue with the unidentified man. While ████ walked, he reached into his pants and appeared to retrieve an item. ████ then appeared to hand the unidentified item to the man. The man then left the area. ████then returned to **ALEXANDER's** Dodge Caravan and got into the front passenger seat. At around 10:20 a.m.**,** the vehicle left the area. Investigators did not see ████ get out of the vehicle prior to its departure. At around 10:25 a.m., ████was observing walking up Spaulding Avenue towards the area where he was originally seated.

14.     At around 10:40 a.m., a BPD undercover officer approached ████ and engaged in a narcotics-related conversation, asking to buy 33 gel capsules of heroin. ████agreed to sell

the heroin. ███████and the undercover officer walked together to 3005 Thorndale Avenue, Baltimore, Maryland. ███████ told the undercover officer to wait. ███████ then walked into the building. After a brief period of time, ███████ returned. Shortly thereafter, the undercover officer paid ███████ a sum of cash and ███████provided the undercover with 33 gel capsules of suspected heroin. The suspected heroin was tested by the BPD laboratory, which later confirmed that the substance contained a detectable amount of heroin.

15.     On July 14, 2020, at approximately 11:02 a.m., a BPD undercover officer walked up to ███████ at 5020/5022 Palmer Avenue in Baltimore. The undercover officer asked to buy heroin from ███████. ███████ then walked with the undercover officer and retrieved a bag containing individual units of suspected heroin in small plastic containers. The undercover officer handed ███████ $180 and ███████ handed the undercover 30 containers of suspected heroin. The suspected heroin is pending testing at the DEA Mid-Atlantic Laboratory.

16.     On July 21, 2020, at approximately 10:45 a.m., a BPD undercover officer met with ███████ at 5020/5022 Palmer Avenue in Baltimore, Maryland. The undercover officer handed ███████$30 and ███████ handed the undercover officer three containers of suspected heroin. The suspected heroin is pending testing at the DEA Mid-Atlantic Laboratory.

## IV.    ALEXANDER OBTAINS SUSPECTED NARCOTICS FROM CROSBY

17.     Interceptions of **ALEXANDER** also revealed that he obtained suspected narcotics from Thomas Corey **CROSBY**, a drug source of supply operating in the Baltimore metropolitan area. On June 5, 2020 at approximately 7:00 p.m., **ALEXANDER**, utilizing **Target Telephone 4**, received a call from 410-892-9918, phone believed to be utilized by **CROSBY**. During the initial portion of the call, **CROSBY** stated, "What's up baby?"  **ALEXANDER** responded, "Who this?" **CROSBY** replied, "This C."  **ALEXANDER** then stated, "Oh what's up homie, what's up homie.

How you doing?" **CROSBY** replied, "I'm good, you good?" **ALEXANDER** responded, "Yeah yeah, I, yeah I was just waiting to see you, see you so I can talk to you." **CROSBY** then stated, "…Um we we good, we good now, um I was just, I had to make sure everything's everything." **ALEXANDER** responded in the affirmative. **CROSBY** stated, "Um, just want you to know, so we we going, we last time we was talking, you know, we gon stay ri...right there, where we said." **ALEXANDER** responded, "Aight … around what time?" **CROSBY** replied, "… Getting it together right now … so, let me pull through together … and I got you…" **ALEXANDER** replied, "Alright, okay no problem." **CROSBY** ended the call by stating, "Aight. I'm on it right now, when I call you back then you know." **ALEXANDER** replied, "Aight okay, appreciate you, alright."

18.     I believe that during this call that that **CROSBY** wanted to confirm that **ALEXANDER** wanted the quantity of drugs that wanted ("had to make sure everything's everything" and that they were going to "stay right there, where we said.") **ALEXANDER** then asked when they would meet and **CROSBY** said he was "getting it together." From my training and experience, I know that drug traffickers often refer to processing/packaging narcotics as "putting it together" or "getting it together." This often refers to the process of taking a larger amount of drugs and packaging into to smaller quantities. The drug trafficker will dilute or adulterate the drug product, thereby increasing the total yield or changing the drug quality. From the context of the call, I believe **CROSBY** meant that he was preparing drugs for distribution and once he was finished that he would be ready to supply **ALEXANDER**. **CROSBY** then said he would let **ALEXANDER** know when he was ready.

19.     On June 6, 2020, at around 4:54 p.m., **ALEXANDER**, using **Target Telephone 4**, received a call from 410-892-9918. During the call, **CROSBY** told **ALEXANDER**, "Hey, I was

8

still tired and you know … you know, I was telling you, um [inaudible], and I'll be at you." **ALEXANDER** responded, "Aight, okay, aight, no problem." I believe this meant that the drugs were not yet ready and that **CROSBY** would notify **ALEXANDER** when they were.

20. On June 9, 2020, at around 9:36 p.m., **ALEXANDER**, using **Target Telephone 4**, received a call from 410-892-9918. **ALEXANDER** answered the call by stating, "Hey, what's up?" **CROSBY** responded, "Yo, ready?" **ALEXANDER** acknowledged. **CROSBY** then told **ALEXANDER** he had to get gas and said, "You know, know where we was at last time right? **ALEXANDER** replied, "Yep." **CROSBY** then stated, "Alright, I'll see you there." I believe that during this call that **CROSBY** told **ALEXANDER** that the drugs were ready and that two agreed to meet at the same location where they met in the past.

21. On June 22, 2020, at approximately 1:53 p.m., **ALEXANDER**, using **Target Telephone 4**, engaged in a brief text message exchange with 410-892-9918, arranging to meet **CROSBY** that night.  Later that night, at around 9:13 p.m., **ALEXANDER**, using **Target Telephone 4**, received a call from 410-892-9918. During the call, **CROSBY** asked, "Are you ready to get together? Or…" **ALEXANDER** responded, "Yeah, yeah, yeah, yep I'm ready." **CROSBY** stated, "Aight, um…do you want me to (unintelligible) that?" **ALEXADER** responded confused and **CROSBY** re-stated, "I said, do you want me to go take care of that?" **ALEXANDER** replied, "I just, I need to see you. I'm…I'm coming to you." **CROSBY** responded, "Alright, um…you wanna see me now?" **ALEAXNDER** replied, "Yeah, right now…going to the same old place." **CROSBY** replied, "Aight, I'll meet you there." At approximately 9:40 p.m., **ALEXANDER**, utilizing **Target Telephone 4** received an incoming telephone call 410-892-9918. During that call **ALEXANDER** said, "I'm right behind you bro, running a little late, I'm right behind you though." **CROSBY** responded, "Aight." I believe in

the above-referenced calls that **ALEXANDER** and **CROSBY** were arranging to meet to conduct a drug transaction.

22.      On June 22, 2020, at around 9:42 p.m., an investigator saw **ALEXANDER** walk out of 1203 North Augusta Avenue in Baltimore and get into his Dodge Caravan. **ALEXANDER** then drove to the BP gas station at 2850 Liberty Heights Avenue in Baltimore, arriving at around 9:52 p.m. **ALEXANDER** parked at a gas pump, but did not get out of his vehicle to pump gas. Instead, **ALEXANDER** then drove to the other side of the gas station and parked next to a 2008 Acura SUV that is registered to **CROSBY**. Approximately one minute later, **ALEXANDER's** and **CROSBY's** vehicles both left the gas station. Investigators followed **ALEXANDER** as he left. **ALEXANDER** drove to 15 North Culver Street in Baltimore, parked his car, and walked into the residence at this address. Tracking data obtained for **ALEXANDER's** Dodge Caravan and **Target Telephone 4** showed the vehicle and phone in the vicinity of this location through the night. Therefore, I believe that **ALEXANDER** spent the night at 15 North Culver Street.

23.      Investigators later reviewed security camera footage obtained from the BP gas station located at 2850 Liberty Heights Avenue, Baltimore, Maryland. The video showed that on June 22, 2020, at approximately 9:53 p.m., **CROSBY's** Acura arrived in the parking lot of the gas station. **CROSBY** then got out of the driver's seat of his vehicle, walked to **ALEXANDER's** Dodge Caravan, and got into the front passenger seat. At around 9:56 p.m., **ALEXANDER's** Dodge Caravan drove to the opposite side of the gas station, near **CROSBY's** Acura SUV. **CROSBY** then got out the vehicle and got back into his SUV.

24.      On June 23, 2020, at approximately 9:35 a.m., a covert surveillance camera captured **ALEXANDER** walking out of 15 North Culver Street.  As **ALEXANDER** walked out of the residence, he held a plastic bag that contained a powdery substance that I believe to be a

controlled substance based on my professional training and experience, as well as the overall investigation. Based on the above-described sequence of events, I believe that **ALEXANDER** met with **CROSBY** on June 22, 2020 and obtained drugs from him. I believe **ALEXANDER** then drove the drugs back to 15 North Culver Street. The next morning, **ALEXANDER** took the drugs out of the house. The following photo, obtained via a covert surveillance camera, shows **ALEXANDER** holding the bag of suspected drugs:



**ALEXANDER walking out of 15 North Culver Street with suspected drugs on June 23, 2020**

### V.     ALEXANDER SUPPLIES BRINKLEY WITH NARCOTICS

25.     On June 17, 2020, at approximately 9:54 p.m., **ALEXANDER**, utilizing **Target Telephone 4** called 443-301-9732, a phone used by Mark **BRINKLEY**. During the initial portion of the call it appeared that **ALEXANDER** and **BRINKLEY** were continuing a previous conversation. **ALEXANDER** stated, "What I was trying to tell you right? … I was at work, I

couldn't get it out, right?" **ALEXANDER** continued, "What dude had wasn't enough in the fresh … it was not fresh …" **ALEXANDER** then said, "I ain't had no change at the moment … to do nothin, but … he had some, I was gonna get like … a hundred, a hundred, a hundred to bring it to you, but it wasn't, it wasn't fresh and I didn't know if that would fuck you up." **BRINKLEY** responded, "... I just need to get out to get some type, you feel me, flow." **ALEXANDER** replied, "Yeah … I can grab a hundred from him." **BRINKLEY** responded, "Aight, please do sir … yeah I can get a flow going, you feel me?" **ALEXANDER** then informed **BRINKLEY** that it (believed to be controlled substances) had been "sitting for a minute." **BRINKLEY** then mentioned a residence located on "Cooks Lane" stating that it was his grandmother's house. At the end of the call **ALEXANDER** stated that he would "grab one hundred" and meet with **BRINKLEY** in the morning. **BRINKLEY** then agreed to meet with **ALEXANDER** in the morning.

26.    On June 18, 2020, at approximately 10:10 a.m., **ALEXANDER**, utilizing **Target Telephone 4** called 443-301-9732. During the initial portion of the call, **BRINKLEY** made reference to "grandma's house" on "Cooks Lane." **ALEXANDER** then stated that he was trying to catch up with (i.e. meet with) his "buddy" but had not been able to yet. Later in the call, **ALEXANDER** asked **BRINKLEY** what the address was for the "old house" and **BRINKLEY** replied that the address was "803 Cooks Lane." **BRINKLEY** subsequently stated that it wasn't the first house but the second house. Later in the call, **ALEXANDER** stated that he was going to get some clothes and that he was trying to get in touch with "little boy." **ALEXANDER** then stated, "Text me a phone number to call or tell me, would you just go out there?" **BRINKLEY** responded by asking what time **ALEXANDER** was "tryin go out there?" **ALEXANDER** responded, "I probably (inaudible) there by 12:30. **BRINKLEY** responded, "A'ight, I'ma call him … him back and let him know you probably be out there 12:30."

27.     I believe that the two calls described above are related. I believe that during the first call that **BRINKLEY** was arranging with **ALEXANDER** a drug transaction where **ALEXANDER** would supply 100 grams of a controlled substance. From the context of the call, I believe **BRINKLEY** was instructing **ALEXANDER** to deliver the drugs to a house on Cooks Lane in Baltimore. From the context of the call, I believe **ALEXANDER** was going to obtain the 100 grams of drugs from a third party, which **ALEXANDER** would then supply. In the second call, **ALEXANDER** and **BRINKLEY** further coordinated the drug transaction. During the call, **BRINKLEY** provided the full address and description of where he wanted **ALEXANDER** to bring the drugs. **ALEXANDER** and **BRINKLEY** then agreed to have the transaction take place around 12:30 p.m. that day.

28.     On June 18, 2020, at approximately 12:09 p.m., investigators observed **ALEXANDER's** Dodge Caravan make a right turn onto Briarclift Road off of Cooks Lane in Baltimore, Maryland. **ALEXANDER's** vehicle then stopped at the entrance to the alleyway behind 803 Cooks Lane. Subsequently, **ALEXANDER's** Dodge Caravan traveled back to Cooks Lane and began traveling down Cooks Lane toward Edmondson Avenue before making a U-turn and traveling back to the alleyway behind 803 Cooks Lane. **ALEXANDER's** Dodge Caravan then pulled into the alleyway and parking directly behind 803 Cooks Lane. At approximately 12:10 p.m., **ALEXANDER**, utilizing **Target Telephone 4**, called 443-324-1095 and spoke to an unidentified man, referred to herein as "UM1095." During the call, **ALEXANDER** told UM1095 that he was on Cooks Lane and about to meet with his "buddy." At around 12:17 p.m., investigators saw an unidentified man speak with **ALEXANDER** while **ALEXANDER** remained in the Dodge Caravan. Shortly thereafter, **ALEXANDER** left the area, while the unidentified man walked towards the rear door of 803 Cooks Lane. Based on this sequence of events, I believe

**ALEXANDER** delivered 100 grams of drugs to a person at 803 Cooks Lane.

29.     On June 18, 2020, at around 9:47 p.m., **ALEXANDER**, using **Target Telephone 4**, called 443-301-9732, a phone used by Mark **BRINKLEY**. During the call, **ALEXANDER** stated, "I'ma stop past, ugh, get you to come out, I got 100 for you." **BRINKLEY** responded, "Aight." **ALEXANDER** replied that he was going to call **BRINKLEY** when he got to "the house." At around 9:55 p.m., **ALEXANDER** used **Target Telephone 4** to call 443-301-9732. During the call, **ALEXANDER** said he was "out front." **BRINKLEY** then said he was coming to the door. Court-authorized tracking of **ALEXANDER's** Dodge Caravan showed the vehicle in the 4000 block of Norfolk Avenue. I believe that **ALEXANDER** delivered 100 grams of drugs to **BRINKLEY**.

30.     On July 22, 2020, at approximately 10:41 a.m., **ALEXANDER**, utilizing **Target Telephone 4**, called **BRINKLEY** at 443-301-9732. The call is as follows:

| | |
|---|---|
| BRINKLEY: | Hey cuz. |
| ALEXANDER: | What's up cuz, calling to check on you, what's up how you feeling? |
| BRINKLEY: | I'm good, just in the house...with the baby. |
| ALEXANDER: | How's everything [voices overlap] aight okay I was saying [U/I][2] how everything going? |
| BRINKLEY: | Everything is cool. |
| ALEXANDER: | Mm...did you ah...did you do anything while you were in the house? |
| BRINKLEY: | Huh? No not really cuz. |
| ALEXANDER: | You sure? |
| BRINKLEY: | Ah, oh you got ah...what is it call? Ah...a baker? |
| ALEXANDER: | Ah...a maker? |
| BRINKLEY: | A baker. |
| ALEXANDER: | A baker? |
| BRINKLEY: | Yeah. |
| ALEXANDER: | Ah... |
| BRINKLEY: | A good baker. |
| ALEXANDER: | [Voices overlap] Ima, a...Ima see when I, see when I go out, I'll see around. |
| BRINKLEY: | Aight, yeah I need a good baker. |
| ALEXANDER: | A, a good baker? |
| BRINKLEY: | Yeah, somebody that knows what they doing. |

---

[2] Denotes that this portion of the call was unintelligible or inaudible to investigators.

ALEXANDER:      Aight, Ima...Ima see, I know one, I know one person so many people use
                him, they have him wrapped, (chuckles) wrapped up. I gotta, I gotta call and
                see if I could a....if I can get a...access granted to him.
BRINKLEY:       (Laughs)
ALEXANDER:      You know he, that's he, that's his line he loves, he loves baking so...and he's
                good at it so they, they keep him with them all, with them all day.
BRINKLEY:       (Chuckles) Oh yeah?
ALEXANDER:      As a matter or fact, [Voices overlap] I'm [U/I] as a matter or fact, as soon as
                I hang up Ima hang up now, Ima call ah...Ima call Shaw [PH][3], Ima call
                Shawn P [PH].
BRINKLEY:       Aight bet.
ALEXANDER:      Aight, Ima call you right back.
BRINKLEY:       Aight cuz.
ALEXANDER:      Aight.

31.     I believe that during this call that **BRINKLEY** said he had been staying inside his

house at 4015 Norfolk Avenue in Baltimore. **ALEXANDER** asked **BRINKLEY** whether he had

processed or packaged drugs in the house ("...did you do anything while you were in the house?")

**BRINKLEY** said that he had not. **BRINKLEY** also asked **ALEXANDER** if he had a "baker."

From the context of the conversation, I believe **BRINKLEY** was looking for someone who could

assist him with processing drugs for distribution. **ALEXANDER** said he knew someone but he

was popular because of his skill and hat as a consequence was very busy. **ALEXANDER** said he

would reach out and find out for **BRINKLEY**.

32.     On July 23, 2020, at approximately 6:00 a.m., DEA investigators executed a search

warrant at **BRINKLEY's** residence, 4015 Norfolk Avenue in Baltimore, Maryland. Inside the

house, investigators encountered **BRINKLEY**, "S.L.," (believed to be BRINKLEY's girlfriend

based on other interceptions), another person, and two children.[4] Agents searched the house and

located a safe in the main bedroom. S.L. unlocked the safe for investigators. Inside the safe,

investigators found a grocery bag containing a bag with suspected fentanyl weighing

---

[3] Denotes a phonetic spelling.
[4] S.L.'s identity is known to investigators but redacted for purposes of this affidavit.

approximately 117 grams, a bag with suspected cocaine weighing approximately 271 grams, and

a latex glove containing suspected heroin, weighing approximately 128 grams. The suspected

narcotics have been submitted to the DEA Mid-Atlantic Laboratory for testing. Agents also located

an iPhone in the residence. One agent called 443-301-9732 and another agent saw the phone

indicate there was an incoming call, confirming **BRINKLEY's** identity.

## VI. ALEXANDER AND MEMBERS OF HIS DRUG TRAFFICKING ORGANIZATION POSSESS FIREARMS

33.     On June 7, 2020, at approximately 9:07 p.m., **ALEXANDER**, using **Target**

**Telephone 4**, called 443-668-3088, a phone believed to be utilized by S.G. **ALEXANDER** and

S.G. engaged in the following conversation:

| | |
|---|---|
| S.G.: | What's up big Al [PH]. |
| ALEXANDER: | What up pop [PH]. |
| S.G.: | Um…damn what did that…um… Reggie [PH] called up and he bought Two (2) uh…joints and the dude ain't got no more in the box. |
| ALEXANDER: | Huh? |
| S.G.: | I said Reggie [PH] just pulled up to me, he just bought Two (2) brand new joints in a box. |
| [Background] | UM: Where we going? |
| S.G.: | Baltimore Street between Carey [PH] and Hill [PH] |
| ALEXANDER: | He just bought Two (2) brand new joints in a box? |
| S.G.: | Yeah. |
| ALEXANDER: | I, I don't need no more [U/I] |
| GWYNN: | You said you don't need no more? |
| ALEXANDER: | No. |
| S.G.: | Well, shit…I need one. |
| ALEXANDER: | Buy the motherfucker then. |
| S.G.: | Huh? |
| ALEXANDER: | Buy it. |
| S.G.: | From who? [Voices overlap] You? |
| ALEXANDER: | Didn't you say Reggie [PH] got one…got them? |
| S.G.: | He said, but they're for him though, he bought them for himself, I guess to put one (1) on his house and one (1) [U/I] house [U/I] |

16

ALEXANDER:     Yeah that's what I, that's what I do, I got one for the house and one I keep outside, I don't,  I ain't, I ain't in no mother fucking military.

S.G.:     Right. I'm trying to get all I can get.

ALEXANDER:     Nah, that don't make sense.

S.G.:     Why not?

ALEXANDER:     Whatchu need, what chu need all the guns you can get for? That don't make sense. You need all the guns that you're gonna use.

S.G.:     Because if something goes wrong, [audio distorted] something happens, you can, you can distribute them, put them [U/I] and put them [U/I] and you know what they're gonna do.

ALEXANDER:     Nah, that's what, that's what a mother-fucker thinking when you are serving Ten (10) Years [Voices overlap] [U/I]

S.G.:     We're going to war, what if we have to go to war

ALEXANDER:     That's what, that's what a motherfucker is thinking when you're Seventeen (17)[Voices overlap] to Twenty-Four (24) years old.

S.G.:     Not really bro.

ALEXANDER:     Yeah it is bro.

S.G.:     Not if, if, if, if something goes wrong yo and…if something goes wrong [Voices overlap]…

[Background]     UM: [U/I]

ALEXANDER:     How many do you need huh? [Voices overlap] how many [distorted audio]

S.G.:     [Voices overlap] Ima talk to you in person, I'm not fucking with this phone

ALEXANDER:     [Voices overlap] That shit makes no sense.

S.G.:     It don't?

ALEXANDER:     Fuck no! I need, I need the ones [voices overlap] [U/I]

S.G.:     [Voices overlap] The same thing, the same thing okay, for instance, for, for example Ronald [PH]. The same thing that happened with you and Andy [PH] right? You bought that shit from him not because you needed it, because you were trying to put some money in his pocket, so boom he puts that shit in the truck but then he stashed Two (2) and puts them back in his bag, Then [U/I] you ain't gonna do no [U/I], you understand what I'm saying, but you won't tell him. You [U/I] just how it is, you know what I mean, he gets slick out of the mouth, say some stupid goofy shit, either way you cluck [PH] him and…One (1) of  the family members or whoever feels like you shouldn't have done that and gets it wrong, it's time to go to war [Voices overlap] [U/I] it was stupid? Yeah.

ALEXANDER:     [Voices overlap] Um, UM…

S.G.:     But it is what it is my n****

ALEXANDER:     I'm telling you if I got Two (2), Two (2), Three (3) guns that's enough, I don't need no closet.

S.G.:     [U/I] is always good, you can never get enough of them, that's like you're ordering soup.  You [U/I], You don't feel me?

ALEXANDER:     Huh?

S.G.:     I said you don't feel me?

ALEXANDER:     Nah, because most motherfuckers [Voices overlap] most motherfucker who think that always get caught with them.

| | |
|---|---|
| [Background] | UM: [U/I], Hot wings, garbage |
| S.G.: | Huh? |
| ALEXANDER: | Shit. |
| S.G.: | Oh damn…Hey yo let me call you back yo. |
| ALEXANDER: | Aight. |
| S.G.: | Aight. |

34.     I believe that during this call that S.G. told **ALEXANDER** that a person named "Reggie" recently bought two guns, referring to them as "joints." As the conversation continued, S.G. stated he was trying to get all the guns he could obtain. **ALEXANDER** disagreed, saying that he had two guns, one in his house and one he keeps "outside." I believe that this means that **ALEXANDER** maintains one firearm inside his residence and another firearm outside of his house such on the property on his vehicle.   **ALEXANDER** has a felony conviction and therefore, prohibited from possessing any firearms. From training and experience, I know that drug traffickers often keep firearms close to where they engage in drug trafficking to protect against rivals or individuals who would rob them of drugs and/or drug proceeds. For example, during the call, S.G. told **ALEXANDER** that it is a good thing to acquire as many firearms as possible in the event they had to go to "war." **ALEXANDER**, however, disagreed and stated that two or three guns was all someone needed to possess.

35.     On June 27, 2020, at approximately 6:34 p.m., **ALEXANDER**, using **Target Telephone 4**, received a call from 443-668-3088. **ALEXANDER** and S.G. engaged in the following conversation:

| | |
|---|---|
| ALEXANDER: | Hey pop. |
| S.G.: | Hey yo. Where y'at yo? |
| ALEXANDER: | Uh, shit, out.  Up by the village [Unintelligible], at Chevy's house.  Gotta go [PH]. |
| S.G.: | Hey, yo, I need a joint, yo.  ASAP. |
| ALEXANDER: | A'ight. |
| S.G.: | Like right…right this second, my n****. I'll pay for it. |
| ALEXANDER: | Yeah. God! Only way… |

| S.G.: | I need it right now, yo. |
| ALEXANDER: | What happened? What happened? |
| S.G.: | I need it right now, yo. |
| ALEXANDER: | Only way you can get one if it was call up there and tell Joe give you one.  That's the only way. |
| S.G.: | Joe got, he got some belong to you? |
| ALEXANDER: | No, he got one, he, he got one he can let you loan.  I don't have, I don't have.  I have nothing. |
| S.G.: | Call, ca... call him, call him, yo.  Call him and tell him... |
| ALEXANDER: | You got it, you got his num... |
| S.G.: | ... to give it to me, yo. |
| ALEXANDER: | ... you got his number, you have to tell him to call me. |
| S.G.: | U/I |
| ALEXANDER: | I don't his number on this phone. |
| S.G.: | A'ight. Okay. |
| ALEXANDER: | Now I have this on this phone. |

36.     I believe, based on my training, knowledge, and experience that during this call, S.G. was attempting to obtain a firearm (a "joint") from **ALEXANDER**.  During the initial portion of this call, S.G. asked **ALEXANDER** where he was and **ALEXANDER** stated that he was in the "Village," a reference to the Edmonson Village area of Baltimore. **ALEXANDER** said he was at "Chevy's house, a nickname for a member of **ALEXANDER's** drug trafficking organization. S.G. then said he needed a firearm as soon as possible. **ALEXANDER** asked S.G. what happened but GWYNN just reiterated that he needed the gun. **ALEXANDER** told S.G. that he did not have one on hand, but that "Joe" (███████████  had one that S.G. could borrow. S.G. asked for ███████████'s phone number but **ALEXANDER** stated that he did not have the number stored in **Target Telephone 4**.

## VII.   THE SEIZURE OF SUSPECTED NARCOTICS FROM ALEXANDER

37.     On August 9, 2020, at around 3:03 p.m., ALEXANDER, using **Target Telephone 4**, received a call from 443-467-8562 and spoke to CROSBY. During the call, ALEXANDER asked to meet with CROSBY that evening. At around 9:05 p.m., ALEXANDER arrived at the BP

gas station at 2850 Liberty Heights Avenue in Baltimore in his Dodge Caravan. At around 9:09 p.m., a gold Toyota minivan arrived at the gas station. Investigators then saw CROSBY get out of the gold Toyota minivan and get into Alexander's vehicle.  After a short period of time, CROSBY got out of Alexander's vehicle and then returned to his vehicle. At around 9:12 p.m., ALEXANDER drove away in his Dodge Caravan.

38.    Investigators followed ALEXANDER and conducted a traffic stop of ALEXANDER at around 9:19 p.m. Investigators were using a marked BPD patrol vehicle. During the stop, investigators searched the vehicle and discovered a plastic bag that contained a white powdery substance in the center console. Based on my training and experience, I believe the substance contained heroin. During the stop, ALEXANDER stated that he had taken the drugs from a member of the community in furtherance of his work with the Safe Streets program. To preserve the integrity of the investigation, DEA investigators seized the suspected heroin and did not arrest ALEXANDER. Investigators weighed the suspected heroin and it weighed approximately 101 grams. Based on the above-described sequence of events, I believe that CROSBY provided suspected heroin to ALEXANDER at the BP gas station.

39.     Based on the foregoing facts, I believe probable cause exists to support the issuance

of a Criminal Complaint charging Ronald **ALEXANDER**, ██████████ Mark **BRINKLEY**,

and Thomas Corey **CROSBY** with the offense of Conspiracy to Distribute Controlled Substances,

in violation of 21 U.S.C. § 846.

Special Agent Ryan M. Kotowski
Drug Enforcement Administration

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with
Fed. R. Crim. P. 4.1 and 41(d)(3) this Aug. 12 , 2020.

Hon. Thomas M. DiGirolamo
UNITED STATES MAGISTRATE JUDGE